Argued and submitted May 24, 2004, OAR 690-505-0400 to 690-505-0630 and OAR 690-521-0100 to 690-521-0600 held invalid May 18, 2005

WATERWATCH OF OREGON, INC.,
an Oregon nonprofit corporation;
Len Mathisen; Craig Lacy; Rebecca Bozarth;
Audrey Simmons; Roger A. Bachman;
Imperial River Company; Deschutes Canyon Fly Shop;
Alder Creek Kayak Supply, Inc.;
Oregon Natural Desert Association,
an Oregon nonprofit corporation;
Northwest Environmental Defense Center,
an Oregon nonprofit corporation;
Alliance for Responsible Land Use in Deschutes County,
an Oregon nonprofit corporation;
Oregon Trout,
an Oregon nonprofit corporation;
and Oregon Council of Trout Unlimited,
an Oregon nonprofit corporation,
*Petitioners,*

*v.*

WATER RESOURCES COMMISSION
and Dan Thorndike,
Chairperson,
Water Resources Commission,
*Respondents.*

A119779

112 P3d 443

Karen A. Russell argued the cause for petitioners. With her on the joint briefs was Christopher G. Winter.

Jas. Jeffrey Adams, Senior Assistant Attorney General, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Wollheim, Presiding Judge, and Schuman, Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

**DEITS, J. pro tempore**

Petitioners seek review of two sets of rules that the Water Resources Commission (commission) adopted in September 2002. OAR 690-505-0400 to 690-505-0630; OAR 690-521-0100 to 690-521-0600. Those rules govern the commission's decision to grant groundwater permits in the Deschutes River Basin. One set of rules amended the Deschutes Basin Program, a water management and use program, to allow for the appropriation of groundwater in the basin and to establish mitigation requirements. The other set of rules provides for the establishment of mitigation banks and mitigation credits in the basin. On review, petitioners assert that the commission exceeded its statutory authority in promulgating those rules. *See* ORS 183.400(4)(b) (providing that "[t]he court shall declare the rule invalid only if" it determines that the rule "[e]xceeds the statutory authority of the agency[.]"). Specifically, petitioners contend that the rules violate various statutes governing (1) scenic waterways, *see* ORS 390.805-390.925; (2) groundwater rights, *see* ORS 537.505-537.795; and (3) instream water rights, *see* ORS 537.332-537.360. For the reasons that we will explain, we conclude that the challenged rules are invalid.

■  We begin with the issue of petitioners' standing to seek judicial review. Petitioners are several entities and individuals. Pursuant to ORS 183.400, "[t]he validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases." *See Lovelace v. Board of Parole (A109609)*, 183 Or App 283, 286-89, 51 P3d 1269 (2002) (reasoning that statutory standing under ORS 183.400 is not limited to persons who are adversely affected or aggrieved by the agency's action and holding that, under ORS 183.400, any person has statutory standing to challenge the validity of a rule). In this case, Roger Bachman, a flyfisherman on the Deschutes River system for the past 40 years, is one of the individual petitioners. We conclude that he has statutory standing to challenge the validity of the rules.

■■  In addition to statutory standing, a petitioner must also have constitutional standing—that is, a petitioner must

demonstrate that a decision in the case will have a practical effect on his or her rights. *Kellas v. Dept. of Corrections*, 190 Or App 331, 334, 78 P3d 1250 (2003), *rev allowed*, 337 Or 282 (2004) (for purposes of constitutional standing, "a petitioner seeking to challenge a rule under ORS 183.400 must demonstrate that he or she has a legally recognized interest at stake and that the relief sought—validation or invalidation of an administrative rule—would have a practical effect on that interest"); *see also Doty v. Coos County*, 185 Or App 233, 59 P3d 50 (2002), *clarified on recons*, 186 Or App 580, 64 P3d 1150 (2003) (holding that a petitioner in a judicial review from the Land Use Board of Appeals had constitutional standing because the land use decision would affect her use and enjoyment of a nearby estuary that she used for passive recreation). Under certain circumstances, a petitioner may submit evidence demonstrating his or her constitutional standing for the first time on judicial review. *Friends of Eugene v. City of Eugene*, 195 Or App 20, 22, 28, 30, 96 P3d 1256 (2004) (holding that the petitioner could demonstrate its constitutional standing for the first time on judicial review of an order of the Land Use Board of Appeals because the need to do so first arose when the petitioner sought to invoke the court's jurisdiction on judicial review).

■     In this case, Bachman's affidavit accompanied the petition for judicial review. In that affidavit, he avers, in part:

> "3.   In 1974 my family, together with another family, purchased some land on the Lower Deschutes River for a fishing camp. Over the past twenty eight years my family and I have spent a lot of time using and enjoying the property by flyfishing the Deschutes, marveling in the splendor of the river and the native fish and wildlife that inhabit the river and boating the river. Through the years we have shared this wonderful experience with many guests.
>
> "4.   Since purchasing the property I have watched flow levels and stream temperature in the Deschutes River get closer and closer to levels that are harmful for salmon and trout. Diminished streamflows have a direct and adverse effect on my use and enjoyment of my property because it destroys habitat needed for wild fish. Diminishment of streamflows in the river system below those flows needed for these important river values threatens to deprive me of

the enjoyment of these activities with my children, as well as deprive my children and their children of activities centered upon the wonders of a free flowing river system such as the Deschutes River.

"* * * * *

"8. I participated in the administrative proceedings surrounding the final adoption of the rules being challenged in the above captioned litigation. I provided comments on drafts of the rule. I believe the rules will result in the ultimate diminishment of streamflows needed for the Deschutes River system, including those segments that I have dedicated so much of my time to protect."

Based on those averments, we conclude that Bachman has constitutional standing.

■ Because Bachman has statutory and constitutional standing and because he and the other petitioners make the same arguments on review, it is immaterial whether the other petitioners have standing, and we do not consider that issue. *Barton v. City of Lebanon*, 193 Or App 114, 118, 118 n 2, 88 P3d 323 (2004). For that reason, as we address the merits of the rule challenge, we use the term "petitioner" to refer only to Bachman.

On review, petitioner asserts that the commission exceeded its statutory authority in (1) amending the Deschutes Basin Program to allow the appropriation of groundwater in the basin and establishing mitigation requirements, OAR 690-505-0400 to 690-505-0630, and (2) promulgating rules governing mitigation credits as well as the establishment of mitigation banks in the basin, OAR 690-521-0100 to 690-521-0600. Petitioner makes three basic challenges to the rules. First, he contends that the rules governing mitigation for new and existing groundwater uses do not maintain the free-flowing character of the waters in the designated scenic waterways in quantities necessary for recreation, fish, and wildlife as ORS 390.835 requires. Second, he contends that the rules "overallocate surface waters in the basin" and will not protect existing instream rights because the "standard for 'mitigation' * * * does not protect instream water rights from diminishment." Finally, petitioner contends that the commission holds the water rights in trust for the public and

that, because the challenged rules "allow ground water withdrawals to deplete surface water flows needed for river segments that support existing public instream uses," the commission violated its "public trust responsibility." Thus, according to petitioner, the rules are invalid.

Respondents, the commission and its chairperson, disagree. They contend that the rules fully comply with the statutory requirements to protect scenic waterways and instream flows and do not violate the commission's public trust responsibilities. Because it is dispositive, we address only petitioner's first argument.

We consider the nature of our review before discussing the merits of this case, because it has a significant effect on our analysis. Respondents assert that a rule challenge pursuant to ORS 183.400 is a "facial" challenge. According to respondents, "[t]he concept of a 'facial' versus an 'as applied' challenge is essentially no different for a rule challenge from what it is for a challenge to the constitutionality of a statute." Thus, respondents reason, "a facial challenge cannot succeed unless it can establish that the challenged enactment could not be validly applied in *any* scenario." (Emphasis in original.) In this case, respondents assert that petitioner cannot prevail unless he "can demonstrate that the rules are not capable of *any* application that is consistent with the governing statutes." (Emphasis in original.)

■■ We disagree with respondents' view of the nature of our review in a rule challenge. Although we and the Supreme Court have used the words "facial" and "as applied" in discussing our review of administrative rules,[1] we do not understand that the use of those terms imported a new means of review for rule challenges pursuant to ORS 183.400. Instead,

---

[1] *See Oregon Newspaper Publishers v. Dept. of Corrections*, 329 Or 115, 118, 988 P2d 359 (1999) ("The reviewing court examines the challenged rules only to determine whether those rules on their face comply with applicable constitutional and statutory requirements. If the rules comply, then any further challenge to them must be made on an 'as applied' basis."); *Purdue Pharma, L.P. v. Dept. of Human Services*, 199 Or App 199, 210, 110 P3d 657 (2005) ("In this case, petitioners' contention that the [Plan Drug List] *might be* applied in a manner contrary to ORS 414.325(6) is an as-applied challenge." (Emphasis in original.)); *Beaver Creek Coop. Telephone Co. v. PUC (A109890)*, 182 Or App 559, 567 n 7, 50 P3d 1231 (2002) (noting that, in a rule challenge pursuant to ORS 183.400, "[o]ur review * * * is 'facial' and not 'as applied' ").

Oregon courts have used those terms to describe the following principles: In a rule challenge pursuant to ORS 183.400, "judicial review * * * is limited to the face of the rule and the law pertinent to it. Numerous individual fact situations can arise under any rule, but judicial review of the rule as applied to each of those situations is reserved to other forums." *AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992). Our task in a rule challenge pursuant to ORS 183.400 is to determine whether "the substance of the action, though within the scope of the agency's or official's general authority, departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute." *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984); *see also Beaver Creek Coop. Telephone Co. v. PUC (A109890)*, 182 Or App 559, 50 P3d 1231 (2002) (applying the standard from *Planned Parenthood Assn.*). Based on those principles, we turn to petitioner's arguments concerning whether the rules governing groundwater appropriations and the mitigation process depart from the legal standard expressed in the pertinent statute.

In this case, petitioner's main challenge is based on ORS 390.835, a provision governing Oregon's scenic waterways. To determine the legal standard imposed by that statute, we examine its text and context, giving words of common usage "their plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). ORS 390.835(1) provides, in part:

> "It is declared that the highest and best uses of the waters within scenic waterways are recreation, fish and wildlife uses. The free-flowing character of these waters shall be maintained in quantities necessary for recreation, fish and wildlife uses."[2]

That subsection, as well as the other subsections in ORS 390.835, applies to certain applications for the use of groundwater if the Water Resources Director (director) finds "based on a preponderance of evidence that the use of ground water will measurably reduce the surface water flows necessary to

---

[2] Segments of the Deschutes River are designated as a scenic waterway. ORS 390.826(5).

maintain the free-flowing character of a scenic waterway in quantities necessary for recreation, fish and wildlife." ORS 390.835(9)(a).

"Measurably reduce" is defined by statute to mean that

"the use authorized under subsection (9) of this section will *individually or cumulatively reduce surface water flows within the scenic waterway in excess of a combined cumulative total of one percent of the average daily flow or one cubic foot per second, whichever is less,* unless:

"(a) The Water Resources Department, the State Parks and Recreation Department, the State Department of Fish and Wildlife, the Department of Environmental Quality and the Department of State Lands unanimously agree to exceed that amount; and

"(b) Exceeding that amount will not significantly impair the free-flowing character of these waters in quantities necessary for recreation, fish and wildlife."

ORS 390.835(12) (emphasis added).

If the director finds that "the use of ground water will measurably reduce the surface water flows necessary to maintain the free-flowing character of a scenic waterway in quantities necessary for recreation, fish and wildlife," ORS 390.835(9)(a), the director shall deny the application for groundwater use unless "[m]itigation is provided in accordance with subsection (10) of this section," ORS 390.835(9)(d)(A), or "the applicant submits evidence to overcome the finding," ORS 390.835(9)(d)(B). ORS 390.835(10) provides that

"[t]he Water Resources Commission or Water Resources Director shall consider mitigation measures and may include mitigation measures as conditions in any water right permit or certificate *to ensure the maintenance of the free-flowing character of the scenic waterway in quantities necessary for recreation, fish and wildlife.*"

(Emphasis added.)

■ Petitioner argues that ORS 390.835 establishes a standard that the commission must apply. Based on the wording of ORS 390.835, the pertinent dictionary definition

of the term "maintain," and the Supreme Court's decision in *Diack v. City of Portland,* 306 Or 287, 759 P2d 1070 (1988), petitioner asserts that ORS 390.835 "requires that the agency prohibit any diminution in scenic flows." Specifically, petitioner argues that the rules are invalid because ORS 390.835 requires that stream flows be maintained and that, under the statute, any mitigation must *"ensure the maintenance* of the free-flowing character of the scenic waterway in quantities necessary for recreation, fish and wildlife." ORS 390.835(10) (emphasis added). In petitioner's view, the statutory language requires that "mitigation" eliminate or fully offset the impacts of a groundwater use on scenic flows. Because the rules "only require that mitigation 'moderate' the effect of ground water use on [those] flows," petitioner contends that the rules depart from the legal standard expressed in ORS 390.835 and, accordingly, are invalid. We agree with petitioner.

As noted above, the text of ORS 390.835(1) requires that "[t]he free-flowing character of these waters shall be *maintained* in quantities necessary for recreation, fish and wildlife uses." (Emphasis added.) In *Diack,* the Supreme Court interpreted ORS 390.835(1) and held that the statute establishes a standard that the commission must administer to protect stream flows. The Supreme Court stated:

"The term 'free-flowing' is self-explanatory and requires no interpretation by the Commission or by this court. The legislature appears to have used the term in a purely descriptive sense; it did not intend to establish a separate statutory standard. * * *

"In contrast, the requirement that the free-flowing character of the water 'be maintained in sufficient quantities necessary for recreation, fish and wildlife uses' *does set a standard the Commission must apply. See Springfield Education Assn. v. School Dist.,* 290 Or 217, 228, 621 P2d 547 (1980). In that case, this court stated:

" '* * * The legislature may use general delegative terms because it cannot foresee all the situations to which the legislation is to be applied and deems it operationally preferable to give to an agency the authority, responsibility and discretion for refining and executing generally expressed legislative policy. * * *'

"*Id.*

"ORS 390.835(1) expresses the general legislative policy that recreation, fish and wildlife uses are the highest and best uses of waters within scenic waterways. To that end, the statute delegates to the Commission the authority to determine the level of stream flow necessary to support recreation, fish and wildlife uses which may themselves differ from time to time."

*Diack*, 306 Or at 299 (omissions in *Diack*; emphasis added).

The maintenance standard in ORS 390.835(1) that the Supreme Court interpreted in *Diack* has not been amended since the court decided that case. In 1995, however, the legislature enacted the subsections of ORS 390.835 concerning groundwater appropriations and mitigation measures. ORS 390.835(9) was added to the statute at that time. It states that the provisions of ORS 390.835 do not apply to an application for the use of groundwater unless the director finds that "the use of ground water will measurably reduce the surface water flows necessary to maintain the free-flowing character of a scenic waterway in quantities necessary for recreation, fish and wildlife." On making that finding, the director must issue an order denying the application unless, among other things, mitigation is provided in accordance with ORS 390.835(10). In turn, that subsection provides that the commission or director shall "consider mitigation measures and may include mitigation measures as conditions in any water right permit or certificate *to ensure the maintenance* of the free-flowing character of the scenic waterway in quantities necessary for recreation, fish and wildlife." (Emphasis added.)

■ The term "mitigation" is not defined in ORS 390.835. Respondents argue that the ordinary meaning of "mitigation" is to "moderat[e] something adverse." Based on the text of ORS 390.835, however, we conclude that mitigation, as the term is used in that statute, must be designed to offset the impacts to surface flows fully rather than merely to moderate those impacts. We reach that conclusion because, consistently with ORS 390.835(1), the 1995 amendments require that mitigation measures "ensure the maintenance" of the necessary flows. The legislature delegated to the agency the

authority to determine the *level* of stream flow necessary to support recreation, fish, and wildlife uses. However, the text of the statutes unambiguously indicates that, once that level is determined, it is to be *maintained*. The applicable definition of "maintain" is "to keep in a state of repair, efficiency, or validity : preserve from failure or decline." *Webster's Third New Int'l Dictionary* 1362 (unabridged ed 2002). Accordingly, based on the Supreme Court's holding in *Diack* and the text of ORS 390.835, we agree with petitioner that, once the agency has determined the necessary stream flows, those flows must be maintained.

Respondents do not appear to dispute that ORS 390.835 requires the maintenance of stream flows. In the notice of proposed rule making in this case, the agency stated that "[t]he scenic waterway designations identify specific flow levels which are to be protected from diminution by subsequent surface water and ground water appropriations."[3] As the Supreme Court contemplated in *Diack*, the agency has exercised its authority to determine the necessary stream flows. The principal disagreement in this case concerns whether the mitigation standards that the challenged rules establish depart from the statutory requirement that the agency "maintain" necessary stream flows.

As we have already indicated, the commission established mitigation standards in two sets of rules. OAR 690-505-0500(1) provides, in part, that "ground water in the Deschutes Ground Water Study Area is closed to further appropriation" with the exception of "a cumulative total of 200 cubic feet per second (cfs)." "Prior to January 1, 2008, or upon reaching 150 cfs of the 200 cfs in [OAR 690-505-0500(1)], whichever comes first," and every five years thereafter, the commission must "evaluate the Deschutes Basin Ground Water Mitigation Rules and associated mitigation to determine whether the restriction in section (1) shall be lifted or otherwise modified through subsequent public rulemaking." OAR 690-505-0500(2); *see also* OAR 690-505-0500(4)

---

[3] Further, at oral argument, the state acknowledged that there is a "no-diminishment" standard.

(providing additional requirement that must be satisfied before the restriction may be lifted). If the commission's evaluation

"indicates that, due to new ground water appropriations, scenic waterway flows and instream water right flows in the Deschutes Basin are met less frequently as compared to long-term, representative base period flows, the Commission shall initiate proceedings to designate all or portions of the Deschutes Ground Water Study Area a critical ground water area(s) under ORS 537.730, immediately close certain areas of the Deschutes Basin to further ground water appropriations, or take other administrative action(s) to ensure scenic waterway flows and instream water right flows in the Deschutes Basin continue to be met on at least an equivalent or more frequent basis as compared to long-term, representative base period flows."

OAR 690-505-0500(5). Additionally, the Oregon Water Resources Department (department), in cooperation with other state agencies, shall "annually evaluate and report on the implementation of these rules." OAR 690-505-0500(3).

"The annual evaluation and report shall include information on new ground water appropriations, streamflow monitoring, and mitigation activity in order to determine whether scenic waterway flows and instream water right flows in the Deschutes Basin continue to be met on at least an equivalent or more frequent basis as compared to long-term, representative base period flows established by the Department."

*Id.*

The rules expressly recognize impacts on stream flows that will arise from groundwater use. For example, OAR 690-505-0600(1) provides, in part, that "[g]round water appropriations within the Deschutes Ground Water Study Area have the potential for substantial interference with surface water rights as described in OAR 690, division 9,[4] and *will measurably reduce scenic waterway flows as defined in ORS 390.835 unless mitigation is provided pursuant to the rules in this division.*" (Emphasis added.) In particular, "[t]he rules in

---

[4] OAR chapter 690, division 9, concerns groundwater interference with surface water.

OAR 690-505-0610 through 690-505-0630 establish the mitigation process for pending and future ground water permit applications in the Deschutes Ground Water Study Area. *Without mitigation, the Department is required by law to deny ground water permit applications in the Deschutes Ground Water Study Area.*" OAR 690-505-0600(3) (emphasis added).

The rules provide that, generally, the department "may only approve a ground water permit application in the Deschutes Ground Water Study Area if mitigation is provided pursuant to these rules." OAR 690-505-0610(1). However, "mitigation," for the purposes of OAR 690-505-0500 to 690-505-0630, is defined to mean "to moderate the impacts to surface water flows from a ground water appropriation by obtaining mitigation credits or by providing for implementation of a mitigation project that results in mitigation water."[5] OAR 690-505-0605(8). "[T]he amount of mitigation water needed for the appropriation of ground water as determined by the Department, calculated in acre-feet" is the "mitigation obligation." OAR 690-505-0605(11). To satisfy that obligation, the amount of mitigation needed is as follows:

"(a)    One mitigation credit per acre-foot of consumptive use based on the ground water permit application: or

"(b)    Mitigation water equal to the volume of consumptive use of the ground water permit application, calculated in acre-feet."

OAR 690-505-0610(5). "A mitigation obligation may be satisfied by obtaining mitigation credits or by providing for implementation of a mitigation project." OAR 690-505-0610(2).

As we have already indicated, "mitigation," as defined in the commission's rules,

---

[5] For the purposes of OAR 690-505-0500 to 690-505-0630,

" '[m]itigation credit' is a means of accounting for mitigation water, calculated in acre-feet, made available by a mitigation project. One mitigation credit is equal to one acre-foot of mitigation water. Mitigation credits are determined and awarded by the Department under Chapter 659, 2001 Oregon Laws (HB 2184) and OAR 690, division 521."

OAR 690-505-0605(10). In turn, "mitigation water" is "water that is legally protected for instream use from implementation of a mitigation project, calculated in acre-feet." OAR 690-505-0605(13). Additionally, OAR 690-521-0100 to 690-521-0600 govern the establishment of mitigation credits and mitigation banks. "Mitigation credits are determined and awarded by the Department upon completion of the project and verification by the Department." OAR 690-521-0200(6).

"means to *moderate* the impacts to surface water flows from a ground water appropriation by obtaining mitigation credits or by providing for implementation of a mitigation project that results in mitigation water."

OAR 690-505-0605(8) (emphasis added). The plain, ordinary meaning of "moderate" is, among other things, "to lessen the intensity or extremeness of : make less violent or excessive : keep within bounds : make moderate or temperate[.]" *Webster's* at 1451. The agency has already determined that "ground water appropriations within the Deschutes Ground Water Study Area * * * will measurably reduce scenic waterway flows as defined in ORS 390.835 unless mitigation is provided pursuant to the rules in this division." OAR 690-505-0600(1). Additionally, the agency determined that, "[w]ithout mitigation, the Department is required by law to deny ground water permit applications in the Deschutes Ground Water Study Area."[6] OAR 690-505-0600(3). In light of those determinations, the rules, which require only moderation of the impacts to surface flows from groundwater appropriations, depart from the legal standard expressed in ORS 390.835 that requires *maintenance* of those flows. Because the rules at issue in this case—that is, the rules governing groundwater withdrawals and mitigation of those withdrawals in the basin and the rules governing mitigation credits and the establishment of mitigation banks—constitute a unitary scheme based on the definition of "mitigation," and because that definition departs from the statutory requirement in ORS 390.835 to maintain flows, we conclude that all of the rules are invalid.

_____

[6] Respondents contend that OAR 690-505-0600(1) is not a "conclusive determination that any *specific* ground water appropriation will in fact measurably reduce surface water flows below protected levels. The foregoing language simply declares the general policy justification for adopting mitigation rules." (Emphasis in original.) To a certain extent, that contention is supported by OAR 690-505-0610(6) to (8), which allow, among other things, the issuance of a groundwater permit without mitigation if the applicant submits evidence and the department finds, based on a preponderance of the evidence, that a specific groundwater use will not measurably reduce surface flows in violation of ORS 390.835. Even in light of those subsections of OAR 690-505-0610, however, respondents' attempt to undermine the significance of the commission's statements in OAR 690-505-0600(1) is unpersuasive. The commission stated the reasons that the mitigation rules are necessary. Those reasons explain the foundation for the rules and are useful in determining whether the rules depart from the legal standard in ORS 390.835.

Respondents' position is that the mitigation standards in the rules are consistent with the statutory obligation to maintain flows. They argue:

"The challenged rules are within the statutory authorization by adopting a dual standard that ensures that quantities of water necessary for scenic waterways and instream water rights will be maintained: (1) by requiring that an *equal* volume of water be placed back into the hydrological system as mitigation for ground water consumptive use withdrawals,[7] and (2) by annual monitoring to ensure that mitigation is succeeding in maintaining protected stream flows and by providing for the use of additional regulatory tools if necessary."

Specifically, they assert that,

"[u]nder the volumetric-based standard adopted in the mitigation rules, every new ground water withdrawal must be conditioned on mitigation in an amount that *equals* the amount of water potentially consumptively used during the same year, even though the impact of ground water withdrawals on surface flows will typically can [*sic*] take years to appear."

(Emphasis in original.)

As we have already explained, however, ORS 390.835 requires the maintenance of surface flows that the

---

[7] Examples of "mitigation projects," which are projects "approved by the Department that result[ ] in mitigation water," OAR 690-505-0605(12), include the following projects described in OAR 690-505-0610(3):

"(a) The allocation of conserved water provided under ORS 537.455 to 537.500 and OAR 690, division 18, where the applicant's portion of the conserved water is allocated and legally protected for instream use;

"(b) The transfer of an existing water right to an instream use if the water right to be transferred is also lawfully eligible for transfer to another out-of-stream use, and for mitigation banks, the time-limited transfer or lease of an existing water right to instream use under ORS 537.348 and OAR 690, division 77;

"(c) A permit to appropriate water for the purpose of artificial recharge of a ground water reservoir pursuant to ORS 537.135 and OAR 690, division 350;

"(d) A secondary permit to use stored water from an existing reservoir obtained pursuant to ORS 537.130 to 537.211 and OAR 690, division 310, provided the secondary permit is for instream use; or

"(e) Other projects approved by the Department that result in mitigation water."

agency determines are necessary. Respondents are correct that the statute does not specify the manner in which the agency must maintain those flows; however, at a minimum under the statutes, the mechanism that the agency uses to achieve the statutory directive must ensure that the impact of a groundwater appropriation is offset in a manner that maintains flows. In this case, the "volumetric-based standard" and the annual monitoring do not ensure the maintenance of the flows, as respondents contend. That is so for three interrelated reasons.

First, maintaining *flows* in quantities necessary for fish, recreation, and wildlife uses is different from maintaining a certain yearly average *volume* of water in a system. As the Oregon Department of Fish and Wildlife explained during the rulemaking proceeding,

> "fish and their habitats are more affected by periodic extreme constraints placed on their population and habitat rather than the average conditions. Basically, in biology, populations can only temporarily grow beyond these constraints provided by their habitat. In the case of fish their populations are ultimately constrained by the low flow periods rather than the average flows. Average measurements smooth out the valleys and peaks in a data set hiding the true magnitude of the valleys and peaks. Flow levels are directly related to available spawning and rearing habitat, especially in the lower Deschutes River where small drops in flow levels result in much larger reductions in available habitat. Allowing the overall low flow periods to decline further will result in a far greater impact to fish populations than would be indicated by average long term flows. In the case of the Lower Deschutes where several species are endangered this could prevent recovery of these species."

Second, as respondents acknowledge, the impacts of the groundwater withdrawal on surface flows may not occur for years. As respondents explain,

> "[t]he effects of ground-water pumping can be expected to be attenuated and delayed in a similar manner and spread

out over time and space. Thus, depending on the location of a well, several years may pass between the time pumping starts and the time the effects of the pumping are reflected in diminished discharge. By the same token, when pumping is stopped, the effect on streamflow can take a similar time to manifest itself."

(Internal quotation marks and record citations omitted.) Additionally, respondents assert that "[t]he impact of a particular groundwater appropriation on surface flows years later would be difficult to measure with existing stream gaging technology, and the timing would be difficult to predict with any certainty."[8] Based on respondents' explanation, we understand that, if groundwater were appropriated today, it is possible that the impacts on stream flows might not occur until five years later. Thus, mitigation that returned an equal volume of water to the system the same year as the appropriation would not maintain flows at the time that the impact on those flows occurs. The fact that there is a complex relationship between groundwater appropriations and surface flows that is difficult to measure does not excuse compliance with the statutory requirement that flows be maintained.

Finally, respondents indicate that they know that groundwater appropriations will impact surface flows, but they do not know the nature of the impact; thus, the annual monitoring requirement appears to serve as the mechanism to gather the data necessary to determine whether the mitigation scheme will maintain surface flows. Respondents, in effect, indicate that they do not know the consequences of issuing groundwater permits under the rules but are engaging in an experiment to find out.[9] In this case, by the time

---

[8] At oral argument, however, respondents asserted that there is a mathematical model that attempts to predict the timing and impact of withdrawals on the surface flows.

[9] That type of experimentation is not allowed under the statutory standard. Under analogous circumstances, in *Fed. of Seafood Hrvstrs. v. Fish & Wildlife Comm.*, 291 Or 452, 460, 632 P2d 777 (1981), the Supreme Court held that the commission in that case was required to find that the statutory requirements had been satisfied before issuing hatchery permits. The court reasoned:

"While the legislature did not wish to foreclose permits for salmon hatcheries which would not risk the kinds of harm listed in ORS 508.710, we

that the impact on flows has been determined, flows have already been affected. That is not what the statute requires.[10]

We recognize that the question of the appropriate balance between the protection and use of the resources at issue here is a policy decision that is appropriately made by the legislature. However, on judicial review, we must rely on the text and context of the statutes that the legislature has adopted to determine its policy choice and are limited to carrying out the policy decision that it has made. In ORS 390.835, the legislature directed that the "highest and best uses of the waters within scenic waterways are recreation, fish and wildlife uses" and established a standard that the free-flowing character of the water necessary for such uses be "maintained." ORS 390.835(1). If the legislature should choose to alter the policy presently embodied in the statutes, it is free to do so.

In sum, ORS 390.835 requires the maintenance of stream flows in quantities that the commission has established as necessary for fish, wildlife, and recreation. The rules at issue in this case require only the moderation of impacts on those flows as a result of groundwater appropriations. "Moderation" of impacts does not satisfy the statutory requirement that stream flows be "maintained." Additionally, because the agency does not know how and when a groundwater appropriation will impact stream flows, the

conclude that it did not contemplate the issuance of such permits on an experimental basis as a way to acquire the data necessary to make findings whether such risks would prove real. *Kids Against the Cut v.* [*Wage and Hour Comm.*], 41 Or App 179, 597 P2d 1264 (1979). If the findings can never be made, it is the legislature's prerogative to rewrite the statute."

*Fed. of Seafood Hrvstrs.*, 291 Or at 460; cf. *Fund for Animals v. Dept. of Fish & Wildlife*, 94 Or App 211, 214, 765 P2d 215 (1988), *rev dismissed as moot*, 307 Or 611 (1989) (reasoning that, in a proceeding under ORS 183.400(1), a rule must be invalidated "when the agency's power to act depends on certain prerequisites and the record affirmatively shows that the agency did not comply with those prerequisites").

[10] We are aware that the commission's decision that the statutory standard will be met must be made on available scientific information, which will not necessarily guarantee that result with absolute certainty. In this case, however, the statutory standard requires "maintenance" of the flows and the commission's rules do not purport to require maintenance of the flows but only "moderation" of the impacts on the flows.

rules do not provide a mechanism to sufficiently ensure the statutory objective is met. Thus, the rules depart from the statutory standard in ORS 390.835.

OAR 690-505-0400 to 690-505-0630 and OAR 690-521-0100 to 690-521-0600 held invalid.