Argued and submitted October 26, 2005, OAR 860-028-0110(7), 860-028-0130,
860-028-0140, 860-028-0150, 860-028-0160, 860-280-0170, 860-028-0180,
and 860-028-0220 held valid May 3, 2006

## QWEST CORPORATION,
*Petitioner,*

*v.*

## PUBLIC UTILITY COMMISSION,
*Respondent,*

*and*

## PACIFICORP,
*Intervenor - Respondent.*

## A123511

135 P3d 321

Lawrence H. Reichman argued the cause for petitioner. With him on the briefs was Perkins Coie LLP.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Stephanie S. Andrus, Assistant Attorney General.

Gerit F. Hull argued the cause for intervenor - respondent. With him on the brief were Charles A. Zdebski, Raymond A. Kowalski, Allison D. Rule, and Troutman Sanders LLP, Washington, D.C.

Benjamin Walters filed the brief *amicus curiae* for League of Oregon Cities.

John P. Graff filed the brief *amicus curiae* for Charter Communications, Inc.

John E. Kennedy, Christopher S. Huther, John Longstreth, and Preston Gates Ellis & Rouvelas Meeds LLP, Washington, D.C., and Richard G. Stewart, Irving, Texas, filed the brief *amicus curiae* for Verizon Northwest Inc.

Before Edmonds, Presiding Judge, and Linder and Wollheim,* Judges.

EDMONDS, P. J.

---

* Wollheim, J., *vice* Richardson, S. J.

## EDMONDS, P. J.

This case is a proceeding under ORS 183.400 in which petitioner Qwest Corporation challenges rules adopted by the Public Utility Commission (PUC) regarding penalties for attachments to utility poles by nonowners in the absence of a contractual relationship between the pole user and pole owner. Qwest argues, among other things, that the PUC exceeded its authority when it enacted the rules. Alternatively, it argues that the legislature made an unconstitutional delegation to the PUC under Article I, section 21; Article III, section 1; and Article IV, section 1, of the Oregon Constitution and that the PUC's rules violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. As explained below, we hold that the rules are valid.

We first summarize the relevant statutes and rules. ORS 756.060 grants to the PUC the authority to "adopt and amend reasonable and proper rules and regulations relative to all statutes administered by the commission." ORS 757.273 gives the PUC the authority to

"regulate in the public interest the rates, terms and conditions for attachments by licensees to poles or other facilities of public utilities and telecommunications utilities. All rates, terms and conditions made, demanded or received by any public utility or telecommunications utility for any attachment by a licensee shall be just, fair and reasonable."

House Bill (HB) 2271, section 9(3) (1999)[1] required the PUC to "adopt rules for certifying a licensee's compliance with laws regulating pole attachments and establishing appropriate sanctions for unauthorized pole attachments." A "licensee" is defined as "any person, firm, corporation, partnership, company, association, joint stock association or cooperatively organized association that is authorized to construct attachments upon, along, under or across the public ways." ORS 757.270(3). An "attachment" is any wire, cable or related device, apparatus or auxiliary equipment installed on

---

[1] HB 2271, section 9, was enacted as Oregon Laws 1999, chapter 832, section 9, and appears in the Oregon Revised Statutes in the note after ORS 757.290.

a pole or other facility for the purpose of telephonic, television, or electrical transmissions. ORS 757.270(1). Under ORS 757.271(1), a person may not install an attachment on another's utility pole "unless the person has executed a contract with and has authorization from the utility allowing the attachment."

Pursuant to the above grants of authority, the PUC promulgated OAR 860-028-0120, which establishes the duties of pole occupants:

"(1) Except as provided in sections (2) and (3) of this rule, a pole occupant attaching to one or more poles of a pole owner shall:

"(a) Have a written contract with the pole owner that specifies general conditions for attachments on the poles of the pole owner;

"(b) Have a permit issued by the pole owner for each pole on which the pole occupant has attachments;

"(c) Install and maintain the attachments in compliance with the written contracts required under subsection (1)(a) of this rule and with the permits required under subsection (1)(b) of this rule; and

"(d) Install and maintain the attachments in compliance with Commission safety rules.

"(2) A pole occupant that is a government entity is not required to enter into a written contract required by subsection (1)(a) of this rule, but when obtaining a permit from a pole owner under subsection (1)(b) of this rule, the government entity shall agree to comply with Commission safety rules.

"(3) A pole occupant may install a service drop without the permit required under subsection (1)(b) of this rule, but the pole occupant must:

"(a) Apply for a permit within seven days of installation;

"(b) Except for a pole occupant that is a government entity, install the attachment in compliance with the written contract required under subsection (1)(a) of this rule; and

"(c)   Install the service drop in compliance with Commission safety rules."

The PUC also promulgated rules that provide for sanctions for violation of the above rules. OAR 860-028-0130 through 860-028-0150 provide for the imposition of monetary sanctions by pole owners on pole occupants that install attachments on the owner's utility poles or facilities that are not authorized under statute or administrative rule. OAR 860-028-0130 provides for a sanction of up to $500 or 60 times the annual rental rate per pole, whichever is higher, against a pole occupant that has no contract with the pole owner, but requires a 60 percent reduction of the sanction if the occupant timely complies with the duties outlined in OAR 860-028-0120. OAR 860-028-0140 provides for a sanction of up to $250 or 30 times the annual rental rate per pole, whichever is higher, on pole occupants that make attachments without a permit from the pole owner, but requires a 60 percent reduction of the sanction if the occupant timely complies with the duties outlined in OAR 860-028-0120. OAR 860-028-0150 provides for sanctions up to $200 or 20 times the annual rental rate per pole, whichever is higher, on pole occupants that install attachments in violation of their contract or permit agreements, or in violation of the PUC's safety rules, but requires a 70 percent reduction of the sanction if the occupant timely complies with the duties outlined in OAR 860-028-0120.

OAR 860-028-0160 through 860-028-0180 relate to a pole owner's choice of sanctions for attachments that violate more than one rule, the time frame for securing a reduction in sanctions by the pole occupant through a plan of correction, and progressive increases in sanctions for noncompliance. In the event that the pole occupant disagrees with the facts asserted by the pole owner or that a violation has occurred, the rules contemplate that the occupant's plan of correction will identify those disagreements. Upon the receipt of a plan of correction, the pole owner must give notice of its acceptance or rejection of the plan. OAR 860-028-0220 provides a framework for the resolution of factual disputes

"so that the pole owner can impose appropriate sanctions, or in the event that a pole occupant is alleging that a pole

owner is unreasonably delaying the approval of a written contract or the issuance of a permit, then either the pole owner or the pole occupant may request a settlement conference before the Joint-Use Association (JUA)."

In the event that the JUA does not settle a dispute between a pole occupant and a pole owner, either may request a hearing before the PUC.

■■    Qwest challenges the above rules that provide for monetary sanctions. In the discussion that follows, we will refer to those rules as the "penalty rules." The scope of our review in this case is constrained by ORS 183.400, which states, in part:

"(3)   Judicial review of a rule shall be limited to an examination of:

"(a)   The rule under review;

"(b)   The statutory provisions authorizing the rule; and

"(c)   Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures.

"(4)   The court shall declare the rule invalid only if it finds that the rule:

"(a)   Violates constitutional provisions;

"(b)   Exceeds the statutory authority of the agency; or

"(c)   Was adopted without compliance with applicable rulemaking procedures."

The following discussion informs an understanding of our scope of review under the statute:

"In a rule challenge pursuant to ORS 183.400, 'judicial review * * * is limited to the face of the rule and the law pertinent to it. Numerous individual fact situations can arise under any rule, but judicial review of the rule as applied to each of those situations is reserved to other forums.' *AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992). Our task in a rule challenge pursuant to ORS 183.400 is to determine whether 'the substance of the action, though within the scope of the agency's or official's general authority, departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute.'

*Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984); *see also Beaver Creek Coop. Telephone Co. v. PUC* (A109890), 182 Or App 559, 50 P3d 1231 (2002) (applying the standard from *Planned Parenthood Assn.*)."

*WaterWatch v. Water Resources Commission*, 199 Or App 598, 604-05, 112 P3d 443 (2005) (ellipsis in original; footnote omitted).

■         Because ORS 183.400 contemplates a challenge only to the rule itself, and because some of Qwest's arguments contemplate an *application* of the challenged rules to particular assumed facts, we decline to address any of Qwest's arguments or the issues that are dependent upon particular factual scenarios. *See AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992) (holding that judicial review under ORS 183.400 is limited to the face of the rule and the laws pertinent to it; judicial review of the rule as applied to factual circumstances is reserved to other forums). Accordingly, we reject those arguments without discussion. We therefore proceed to consider the first issue that is properly before us: whether the legislature authorized the PUC to promulgate the penalty rules.[2]

        Although Qwest agrees that the legislature has granted the PUC the authority to regulate utilities and telecommunication facilities under ORS 756.040, including the authority under ORS 756.060 to adopt "reasonable and proper rules and regulations relative to all statutes administered by the commission[,]" and the authority under ORS 756.160(1) to "enforce all laws of this state relating to public utilities and telecommunication utilities[,]" it argues that the PUC does not have the general authority to impose penalties. Qwest relies on ORS 756.160(4) in support of that proposition. ORS 756.160(4) provides:

> "Any forfeiture or penalty provided for in any law administered by the commission shall be recovered by an action brought thereon in the name of the State of Oregon in any court of appropriate jurisdiction."

_____

[2] Qwest does not argue that the rules were adopted without compliance with the applicable rulemaking procedures.

In Qwest's view, the "penalty rules" do not comply with the mandate of ORS 756.160(4) because that statute "requires all penalties provided in all laws administered by the commission to be recovered in the name of, and for the benefit of, the State of Oregon" and under the challenged rules, the penalties are initially imposed by pole owners. Second, according to Qwest, the penalty rules are flawed under ORS 750.160(4) because "such penalties may not be recovered absent the full range of procedures and protections available in court proceedings."

Qwest also argues that the PUC's penalty rules are not authorized by HB 2271 and ORS 757.271, contrary to what the PUC determined. The PUC adopted the penalty rules to implement provisions of HB 2271, section 9, which was enacted as Oregon Laws 1999, chapter 832, section 9. ORS 757.271(2) is a part of HB 2271 that was codified.[3] Section 9(3) of HB 2271 appears in the Oregon Revised Statutes in the note after ORS 757.290. In Qwest's view, the penalty rules exceed the scope of ORS 757.271(2) because the rules provide for penalties to be imposed on "pole occupants" for *all* unauthorized attachments. Qwest reasons that the phrase "pole occupants" in the rule encompasses a broader range of entities than "licensees," the class of entities contemplated by ORS 757.271(2).

■      Qwest's arguments under ORS 183.400(4)(b) with regard to the PUC's penalty rules require the following analysis:

> "In the proper sequence of analyzing the legality of action taken by officials under delegated authority, the first question is whether the action fell within the reach of their authority, the question which * * * is described as jurisdiction. If that is not in issue, * * * the question is whether the substance of the action, though within the scope of the agency's or official's general authority, departed from a legal standard expressed or implied in the particular law

---

[3] ORS 757.271(2) provides,

"A licensee shall report all pole attachments to the pole owner. A pole owner may impose on a licensee a penalty charge for failing to report an attachment. The pole owner also may charge the licensee for any expenses incurred as a result of an unauthorized attachment or any attachment that exceeds safety limits established by rule of the commission."

being administered, or contravened some other applicable statute. These steps are designed to assure that the challenged action * * * was authorized by the state's * * * politically accountable policy makers."

*Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984).

With the above sequence in mind, we turn to the provisions of the applicable statutes. HB 2271, section 9(1) directed the PUC to establish a task force to advise it on "policies and regulations for accommodating changes in the utility industries while maintaining safe and efficient utility poles, attachment installation practices and rights of way." In particular, section 9(3) of HB 2271 directed the PUC to adopt "appropriate sanctions for unauthorized pole attachments." Thus, we can say confidently that the promulgation of the penalty rules falls within the reach of the legislature's grant of authority to the PUC.

■ The next question is whether the substance of the penalty rules departs from the legal standards contained within that grant of authority. To determine the legal standards imposed by the statutes under which the PUC promulgated the penalty rules, we examine their text and context, giving words of common usage "their plain, natural and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). Also, the exercise of rulemaking authority by an agency implicates our standards of review. The allocation between agencies and courts of the responsibility to give specific meaning to statutory terms depends on the nature of the terms themselves. Under *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980), there are three categories of statutory terms, each of which requires a different level of appellate court review. The categories are "exact terms," terms that impart relatively precise meanings so that their applicability involves only agency factfinding; "inexact terms," terms that embody a complete expression of legislative meaning, although that meaning may not always be obvious; and "delegative terms," terms that express incomplete legislative meaning that the agency is authorized to complete. Ultimately, however, although the legislature may have given an

agency the authority to enforce a particular statute or carry out a statutory purpose, the determination of the meaning of the statute that grants the authority to the agency is one of law for the court. *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353-54, 15 P3d 29 (2000) (quoting *Springfield Education Assn.*, 290 Or at 224). Nonetheless, if the legislature granted authority to the agency to complete the meaning of a delegative term, we will defer to the agency's interpretation so long as it is consistent with the legislature's purpose. *J. R. Simplot Co. v. Dept. of Agriculture*, 340 Or 188, 197, 131 P3d 162 (2006).

Our review of the penalty rules in connection with the legislature's announced objectives does not persuade us that the penalty rules depart from any legal standard expressed in an applicable statute, nor do they contravene some other applicable standard. The PUC adopted the penalty rules pursuant to HB 2271. As we have said above, section 9(3) of HB 2271 directed the PUC to adopt "appropriate sanctions" for unauthorized acts regarding utility poles. The relevant definition of "appropriate" is "**1 :** specially suitable **:** FIT, PROPER." *Webster's Third New Int'l Dictionary* 106 (unabridged ed 2002). Therefore, "appropriate sanctions" in the context of the legislature's grant of authority to the PUC are those that are specially suitable or proper to encourage safe and efficient poles and to prevent unauthorized attachments. What constitutes an "appropriate sanction" in connection with the legislature's purpose has been left to the PUC. In other words, the legislature had delegated its authority in that regard to the PUC, and accordingly, we defer to the PUC's actions in that regard so long as they are consistent with the legislature's purpose to promote the establishment and maintenance of safe and efficient utility poles and other applicable laws.

More specifically, Qwest's reliance on ORS 757.271(2) is misplaced. Indeed, ORS 757.271(2) authorizes pole owners to impose penalties on pole occupants in only one instance: when a pole occupant fails to report an attachment. In contrast, HB 2271 authorized the PUC to establish appropriate sanctions for all "unauthorized" attachments, a much broader grant of delegative authority. Likewise, Qwest's

focus on the word "licensee" in ORS 757.271(2) is unpersuasive. HB 2271, section 9(2)(a), directs the task force to "[d]evelop and submit * * * rules for determining appropriate sanctions for unauthorized attachments" and section 9(3) directs the PUC to adopt rules for "establishing appropriate sanctions for unauthorized pole attachments." No language in either section limits the imposition of sanctions to those who are "licensees." Because, as the legislature contemplated, the sanctions that may be imposed under the rules are designed to deter unauthorized and unsafe attachments on utility poles, the PUC did not exceed its authority by adopting the challenged rules.

■     Next, we consider whether the challenged rules violate any constitutional provision.[4] Qwest argues that ORS 757.271(2) and HB 2271 constitute an unconstitutional delegation of governmental power to private parties, because they do not provide for "any governmental role" in the imposition of penalties. It explains:

> "It is a basic principle of Oregon government, as established by the separation of powers provisions of the state constitution and numerous court decisions, that governmental power must be exercised by the government. The legislature may delegate power to state agencies, but the legislature may not abdicate its responsibilities completely in making such delegations. Moreover, neither the legislature nor any agency may delegate governmental power to parties outside the government without reserving the ultimate right to make governmental decisions and without

---

[4] Qwest bases its arguments on Article I, section 21; Article III, section 1; and Article IV, section 1, of the Oregon Constitution. Article I, section 21, provides, in part:

"Nor shall any law be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution[.]"

Article III, section 1, provides:

"The powers of the Government shall be divided into three seperate [sic] departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Article IV, section 1, provides, in part:

"The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives."

providing adequate procedural safeguards to persons whose rights may be affected by the exercise of governmental power."

In Qwest's view, the PUC did not retain a sufficient role in the imposition of penalties for unauthorized attachments, nor do its rules provide adequate procedural safeguards and procedures for reviewing factual disputes. Also, Qwest contends that pole occupants are deprived of their property without due process of law under the Fourteenth Amendment to the United States Constitution because penalty decisions are made by non-neutral decision-makers.

■       The fundamental inquiry regarding issues of legislative delegation is "whether the procedure established for the exercise of the power furnishes adequate *safeguards* to those who are affected by the administrative action." *Warren v. Marion County et al*, 222 Or 307, 314, 353 P2d 257 (1960) (emphasis in original). Qwest, by limiting its focus to ORS 757.271(2), disregards the fact that the penalty rules were promulgated under the authority of multiple statutes and HB 2271. Those statutes, when read together, reflect an overall statutory scheme intended to promote safe and efficient utility poles and attachments and to provide a process for regulation.[5]

---

[5] Indeed, ORS 757.271(1) states that *"[s]ubject to the applicable regulations of the Public Utility Commission,* a person shall not establish an attachment to a pole or other facility * * * unless the person has executed a contract with and has authorization from the utility allowing the attachment." (Emphasis added.) Also, ORS 757.273 provides that

"[t]he Public Utility Commission of Oregon shall have the authority to regulate in the public interest the rates, terms and conditions for attachments by licensees to poles or other facilities of public utilities and telecommunications utilities. All rates, terms and conditions made, demanded or received by any public utility or telecommunications utility for any attachment by a licensee shall be just, fair and reasonable."

In addition, ORS 757.290 provides that "[t]he procedures of the Public Utility Commission for petition, regulation and enforcement relative to attachments, including any rights of appeal from any decision thereof, shall be the same as those otherwise generally applicable to the commission." Also, ORS 756.500(1) provides that

"[a]ny person may file a complaint before the Public Utility Commission, or the commission may, on the commission's own initiative, file such complaint. The complaint shall be against any person whose business or activities are regulated by some one or more of the statutes, jurisdiction for the enforcement or regulation of which is conferred upon the commission."

By authorizing the PUC to promulgate rules implementing its intention, the legislature has delegated to the PUC the authority to adopt standards and promulgate sanctions regarding unauthorized pole attachments. However, a potential problem with the PUC's rules is that, as Qwest correctly points out, an interested party (*i.e.*, a pole owner) initially imposes the sanction on the pole occupant that is in violation of the rules. When an attachment is made without a contract, without a permit, or in violation of a contract or a permit, or when the attachment violates the PUC's safety rules, or when there is a failure to report an attachment, the private party may impose the particular sanction that is contemplated by the applicable rule. Nonetheless, before the occupant is required to pay any sanction, the occupant has several mechanisms by which to dispute the underlying facts and the reasonableness of the plan of correction. First, the pole owner or the occupant may request a settlement conference before the Joint Use Association, an organization composed of representatives of pole owners, pole occupants, and government entities. OAR 860-028-0210. If the dispute is not settled as a result of the settlement conference, either party may request that the PUC resolve the dispute under its statutory authority. OAR 860-028-0220. Finally, the commission's orders are subject to judicial review under ORS 756.610.

In *Horner's Market v. Tri-County Trans.*, 256 Or 124, 132-33, 471 P2d 798 (1970), the court stated that, "the test for the validity of the delegation * * * should be whether the practical necessities of the efficient administration of legislative policy requiring the delegation of discretion outweigh the danger of discriminate action." Two decisions of this court help to illustrate the application of that principle. In *Corvallis Lodge No. 1411 v. OLCC*, 67 Or App 15, 677 P2d 76 (1984), the Oregon Liquor Control Commission enacted a rule regulating the by-the-drink sale of liquor by private clubs and fraternal and veterans' organizations to nonmembers. Under the rule, such licensees who desired to host a nonmember event at which liquor was to be sold were required to contact all commercial establishments within a 10-mile radius that sold liquor by the drink and to ascertain whether they were willing to host the event. In effect, the

rule, among other objectionable features, gave commercial establishments the authority to veto the event based on the ability to accommodate the event regardless of their intention to host it. We held that the rule constituted "an invalid delegation of governmental authority to private individuals, because it fails to provide procedural safeguards to protect against the unaccountable exercise of government power delegated to [the commercial establishments]." 67 Or App at 22.

We came to a different conclusion in *Medford Firefighters Assn. v. City of Medford*, 40 Or App 519, 595 P2d 1268 (1979), where we rejected the argument that a statute providing for compulsory arbitration created an unconstitutional delegation of legislative power to an arbitration panel. In that case, the City of Medford challenged the appointment of an arbitration panel by the Employment Relations Board (ERB) in a dispute between the city and its firefighters regarding a new employment agreement. The city argued, in part, that ERB's action constituted an unconstitutional delegation of legislative authority to a private party because "the compulsory and binding arbitration statutes * * * do not provide adequate safeguards to prevent an arbitrary exercise of delegated authority and because they delegate legislative power to a private person." 40 Or App at 524-25. We observed that "[d]iscriminatory action is unlikely because the arbitrator may have no personal interest in the outcome and because his decision must be based on the factors set out by the legislature[.]" *Id.* at 525-26. We also observed that the challenged statute provided for judicial review of the arbitrator's decisions and that the arbitrator "is not to have a personal interest in the subject of the arbitration," distinguishing it from other statutory schemes as to which the Supreme Court had held the delegation of price-setting powers to private parties to be unconstitutional. *Id.* at 527.

Initially, we observe that the PUC has not delegated any rulemaking authority to private parties in the sense that private parties legislatively fix the conditions or events for which sanctions may be imposed. Rather, through the promulgation of its rules, the PUC has completed the legislation enacted by the legislature and has itself determined the conditions or events that could lead to sanctions. In that sense,

the role of pole owners under the rules is unlike the role of the commercial liquor vendors in *Corvallis Lodge No. 1411,* who could arbitrarily defeat an application to hold a nonmember event. Rather, the role of a pole owner under the rules is more in the nature of a prosecutorial role, a role in which an allegedly injured pole owner initiates a proceeding that could result ultimately in the pole occupant having to pay a sanction. Even though the pole owner has a personal interest in the outcome, the pole owner is not the decision-maker about whether a sanction can be ultimately imposed or the amount of any sanction. Indeed, the rules create a multi-layered review process in which the PUC resolves disputed issues of fact and makes determinations of reasonableness that obviate the concern that a decision about sanctions will ultimately be based on private interest. In that way, the rules operate in a similar manner to the statute in *Medford Firefighters Assn.*, where the delegation of decision-making authority to a private arbitration panel was constrained by specific statutory safeguards. For those reasons, we conclude that the rules satisfy the test that the danger of discriminatory action not be outweighed by the practical necessities of the efficient administration of legislative policy. It follows that the rules comport with the constitutional provisions relied on by Qwest.

Finally, Qwest argues that the penalty rules violate the Equal Protection Clause of the Fourteenth Amendment because they exempt governmental entities. Qwest concedes that, under its argument, the rules are subject to a rational basis standard of review. Under that standard, laws are presumed to be valid and will be upheld if "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* 509 US 312, 320, 113 S Ct 2637, 125 L Ed 2d 257 (1993). The "purpose or rationale supporting [the] classification need not be actually articulated by the legislature." *Id.* Rather, "a classification must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (internal quotation marks omitted). The burden, therefore, falls "on the one attacking the legislative arrangement to negative

every conceivable basis which might support it, * * * whether or not the basis has a foundation in the record." *Id.* (Internal quotation marks omitted.)

Here, Qwest states that it "is not aware of any rational relationship between the disparate treatment and a legitimate governmental purpose." But such an argument fails to satisfy Qwest's burden under the applicable standard of review. The stated purpose of the task force established by HB 2271, section 9(1) was to advise the PUC "on policies and regulations for accommodating changes in the utility industries while maintaining safe and efficient utility poles, attachment installation practices and rights of way." The statutory definition of "licensee" does not encompass government entities. ORS 757.270(3). It is therefore plausible to assume, given that limitation, that the legislature sought to address problems caused by private entities, as distinguished from governmental entities, who are presumed to act in the public interest. In our view, that limitation has a rational basis. We conclude therefore that Qwest's constitutional challenges fail for all of the above reasons.

OAR 860-028-0110(7), 860-028-0130, 860-028-0140, 860-028-0150, 860-028-0160, 860-280-0170, 860-028-0180, and 860-028-0220 held valid.